<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FOX ROTHSCHILD LLP**
49 Market St.
Morristown, NJ 07960
Mark E. Hall, Esq.
Martha B. Chovanes, Esq.
Michael R. Herz, Esq.
mhall@foxrothschild.com
mchovanes@foxrothschild.com
mherz@foxrothschild.com
Telephone:  (973) 992-4800
Facsimile:  (973) 992-9125
*Proposed Counsel for L'Occitane, Inc.*

</td></tr>
</table>

|  |  |
|---|---|
| In Re: | |
| L'OCCITANE, INC., | Chapter 11 |
| Debtor. | Case No. |
| | Judge: |

### DECLARATION OF YANN TANINI
### IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS

I, YANN TANINI, being of full age, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am the Regional Managing Director of L'Occitane, Inc. ("the "Debtor"), the debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and in that capacity, I am fully familiar with the Debtor's daily operations and books and records, and submit this Declaration in support of the first day applications and motions (the "First Day Motions")[1] filed in the Debtor's Chapter 11 Case.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions.

2.      This Declaration is intended to provide the Court and parties-in-interest with an understanding of the Debtor's business and the circumstances that precipitated the Chapter 11 filing, as well as to support the various factual bases for the First Day Motions that have been filed in connection with the Chapter 11 Case.  The First Day Motions are necessary to facilitate an orderly and effective transition into chapter 11 while minimizing the disruption to the Debtor's business operations.

3.      Unless otherwise stated, all facts set forth herein are based on my personal knowledge, my review of relevant documentation of the Debtor, information provided to me by the Debtor's employees and professionals, or my opinion based on my experience and knowledge with respect to the operations and financial affairs of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

4.      I have served as the Regional Managing Director of the Debtor since March 2019. As Regional Managing Director of the Debtor, I oversee the day-to-day operations of the Debtor.

5.      To familiarize the Court and parties-in-interest with the Debtor, the relief sought in the various First Day Motions, and the Debtor's need to restructure through chapter 11, this Declaration is organized in the following sections:

       a.   Part I provides an overview of the Debtor's business, including its history, corporate structure, and business operations.

       b.   Part II discusses the Debtor's capital structure, including its assets and liabilities.

       c.   Part III addresses the events precipitating the Debtor's Chapter 11 filing and the Debtor's goals for the case.

d.   Part IV provides an overview of the First Day Motions.

**Preliminary Statement**

6.    The Debtor is a national retail chain that sells and promotes the internationally renowned "L'OCCITANE en Provence" beauty and well-being products brand in the United States through boutiques in 36 states and its website.  Like most retailers in the United States, the Debtor has been impacted by the COVID-19 pandemic, which has significantly limited retail operations throughout the country and suppressed consumer willingness to shop in person. Indeed, the Debtor's retail revenue between April and December 2020 decreased by 56.5% compared to the same period during the prior year.  These changes in consumer shopping habits may endure even after the pandemic subsides, continuing to impact brick-and-mortar retail into the future.

7.    Even prior to the pandemic, the Debtor was experiencing a decline in sales revenue from its brick-and-mortar boutiques, while its e-commerce revenue has dramatically increased.  Consequently, the Debtor's lease obligations were becoming increasingly untenable and prompted the Debtor to assess and gradually reduce its lease portfolio.  The profound and sustained impact of the pandemic, however, has forced the Debtor to more aggressively address the rapidly widening gulf between its brick-and-mortar retail revenue and its substantial lease obligations, which no longer reflect the market.  To this end, the Debtor diligently attempted to negotiate new lease terms with its landlords in the hope of achieving an out-of-court restructuring.  Landlords, however, have been reluctant to negotiate the type of long-term adjustments to leases that are necessary to ensure the Debtor's continued viability.

8.    After much deliberation, the Debtor has determined that restructuring through chapter 11 presents the best means for the Debtor to address its challenges and promote sustained

success.  Most particularly, through this Chapter 11 Case, the Debtor intends to reject certain leases in order to right-size its brick-and-mortar footprint to better position itself for long-term success.  It is believed that such efforts will enable the Debtor to better adapt in light of the pre-pandemic shift to online purchasing as well as the impact of the COVID-19 pandemic on brick-and-mortar retail sales.

## I.      The Debtor's Business

9.      The Debtor is a leading retailer in the United States of beauty and well-being products rich in natural and organic ingredients that preserves and celebrates the traditions of Provence.  The L'OCCITANE en Provence brand has gained iconic status globally for its premium body and bath, hand, hair, and fragrance products as it captures the true art de vivre of Provence, offering a sensorial immersion in the natural beauty and lifestyle of the South of France.

### A.      Corporate Parent and Philosophy

10.      The Debtor is the wholly-owned United States subsidiary of L'Occitane International, S.A. (the "Parent" or "International"), which is organized under the laws of Luxembourg and headquartered in Plan-Les-Ouates, Switzerland.  The L'Occitane brand was originally founded in 1976 in Manosque, France by Olivier Baussan, who used a steam distillation process to produce essential oil from wild rosemary and lavender, as well as manufactured vegetable-based soaps, which he sold in the open air markets of the Provence region of France.[2]  The name "L'Occitane" hails from the women of Occitania, the area spanning southern France, northeastern Spain, and northern Italy during the Middle Ages.  The first L'Occitane factory and boutique opened in 1981 in Volx, France.

---

[2] The use of "L'Occitane" herein shall refer to the brand name that has been in use since 1976, and was rebranded as "L'Occitane en Provence" in the 1990s.

11.    In 1994, Austrian businessman, Reinold Geiger, acquired a 33% stake in International's predecessor, and eventually became the majority shareholder in 1996.   Under Geiger's stewardship, the Parent as an international group was formed in 1997 with a strategy of internationalization through launching or acquiring a number of brands or product lines throughout the globe that shared and helped promote International's commitment to sourcing from natural and organic ingredients.   In combination with its affiliates, International has boutiques in over 90 countries in North America, South America, Europe, Asia, Australia and Africa, and also sells products through its affiliates' web platforms.   Since 2010, International has been listed on the Hong Kong Stock Exchange.

12.    At the heart of the L'Occitane brand is a commitment to four pillars: traceability, sustainability, fairness, and quality.   With respect to traceability, L'Occitane strives to purchase local products whenever possible, in order to reduce its carbon footprint and support local business, for the benefit of the social fabric of the region.   Priority is given to small, integrated networks, to bring added value to the producer and have complete control over the traceability of extracts, from the seeds right up to the finished product.

13.    With respect to sustainability, L'Occitane respects both humankind and the environment.   Importantly, L'Occitane does not compromise with regard to the protection of endangered species or communities.

14.    Fairness is evidenced by a commitment to build real partnerships that are strengthened, whenever possible, by multi-year contracts with producers.   These contracts guarantee producers a minimum purchase volume, which ensures that they have a reliable, lasting outlet for their product, at a price that is agreed to by all parties.   Additionally, L'Occitane has followed a coherent path for years, with the unfailing ambition to preserve and regenerate

biodiversity while also strengthening relations of trust and fair trade with its partner-producers of natural raw materials.  L'Occitane's supply of argan, coconut, and shea butter are Fair Trade certified and a percentage of the purchase price of the raw material is donated to local development projects.

15.     The fourth pillar, quality of the plant materials, is affected by the growing, harvesting, drying and storage conditions.  L'Occitane guarantees quality through specifications determined by analytical, quality and regulatory departments, and with the help of its technical partners on the ground.  L'Occitane promotes organize certified farming for its key materials, using methods that respect ecosystems.  Out of 66 ingredient supply chains, 42 are organic.  The harvesting of wild plants is governed by sustainable harvesting guidelines, to protect the integrity and habitat of these plants.

16.     Neither the Debtor's Parent nor any affiliates have commenced chapter 11 or insolvency proceedings.

**B.     The Debtor's Operations**

17.     The Debtor was formed on July 10, 1995 as a means to expand the L'Occitane brand in the United States.  The Debtor is incorporated in the state of New York, and maintains its headquarters at 111 West 33rd Street, 20th FL, New York, New York 10120.

18.     The Debtor opened its first boutique in the United States in 1996.  The Debtor presently operates 166 boutiques in 36 states and Puerto Rico, at which the Debtor sells L'Occitane and affiliate-branded cosmetic and well-being products.  The majority of the boutiques are located in regional malls, but there are also several street-front locations, airport locations,[3] and outlets.[4]  The Debtor also sells products directly to customers through its website,

---

[3] The Debtor also owns a 65% interest in a joint venture with Corliss LLC that operates eight (8) L'Occitane boutiques in airports within the United States.

https://www.loccitane.com/en-us/.    As of the fiscal year that ended on March 31, 2020, the

Debtor comprised 9.1% of the Parent's consolidated sales.

19.    The L'Occitane products sold by the Debtor are manufactured by International,

which works directly with French farmers in the immortelle fields of Corsica and the lavender

fields of Provence, among other sources of natural ingredients.  The sourcing of the L'Occitane

brand products is important to ensure that the ingredients used are of the highest quality and

sourced as sustainably as possible.

20.    The Debtor maintains a primary distribution center at 120 Herrod Boulevard,

Dayton, New Jersey, 08810 (the "Distribution Center"), from where it ships its products to the

boutiques and directly to customers.

## II.    Capital Structure

### A.    Assets and Liabilities

21.    As of the Petition Date, the Debtor's balance sheet reflects approximately

$161,063,000 in assets and approximately $161,659,000 in liabilities.

22.    The Debtor does not own any real estate.  Its assets primarily include cash,

inventory, machinery and equipment, leases, and accounts receivable.

23.    Outside of equipment financing, the Debtor's assets are not encumbered by or

otherwise subject to any to liens or secured obligations.  Other than the sales revenue it

generates, the Debtor's chief financing source is International, which has provided capital

assistance to the Debtor over the years in the form of periodic unsecured loans intended to assist

the Debtor fund operating shortfalls pursuant to a certain Group Cash Management Agreement

between the Debtor and International, dated April 1, 2018.  This arrangement has provided

---

[4] The Debtor also provides products to spas in Washington, D.C., Port St. Lucie, Florida, and San Francisco, California, but these spas are not operated by the Debtor.

funding to the Debtor so that the Debtor may promote and sell the L'Occitane brand in the United States without the Debtor having to leverage its assets.  As of the Petition Date, International is by far the Debtor's largest unsecured creditor, as it is owed approximately $26,000,000 related to loans under the Group Cash Management Agreement, plus approximately $4,500,000 for inventory,[5] for a total liability of approximately $30,500,000.  Additionally, the Debtor has executed letters of credit backed by Crédit Industriel et Commercial ("CIC") in favor of certain landlords in the aggregate amount of approximately $1.77 million.

24.    Outside of International's claim, the Debtor's largest liability is to its landlords. As noted, the Debtor does not own any real estate.  Instead, the Debtor leases all of its 166 locations, as well as its corporate offices and the Distribution Center under operating leases that expire on various dates, with the longest lease term on the Petition Date expiring in 115 months. As of the Petition Date, the aggregate amount of annual and monthly gross rent due to landlords on all leases is approximately $30,290,984.00 and $2,524,249.00, respectively.  As of December 31, 2020, the Debtor's total remaining lease obligations under the terms of its current leases is approximately $112,754,750.00.  As of Petition Date, the Debtor is currently $15,087,468.00 in arrears on its leases.  Landlords are holding approximately $516,000.00 in security deposits (of which $125,000.00 is held by the landlord for the Distribution Center).  As discussed below, the Debtor's primary goal in chapter 11 is to right-size its physical footprint in part by rejecting certain leases to enable the Debtor to better adapt and cultivate sustained profitability in light of the increasing shift to online purchasing and the impact of the COVID-19 pandemic on brick-and-mortar retail sales.  It is anticipated that the total amount of unsecured claims in this case will increase as leases are rejected.

---

[5] The Debtor typically pays International for inventory on sixty (60) day terms.

25.     Additional unsecured claims against the Debtor are believed to be minimal and include: (i) accrued and unpaid trade and other unsecured claims incurred in the ordinary course of business; and (ii) unpaid accounts owed to the Debtor's vendors and suppliers in the ordinary course of business.  The Debtor has typically paid such debts as they have come due, and thus most liabilities owed to vendors and suppliers as of the Petition Date comprise recent balances. It is therefore anticipated that certain vendors and suppliers may have administrative priority claims under section 503(b)(9) of the Bankruptcy Code for the value of unpaid goods received by the Debtor within 20 days of the Debtor's Chapter 11 filing.

26.     As of the Petition Date, the Debtor is current on sales and use taxes.  For the months of January through October 2020, the Debtor paid an average of $514,000.00 in sales and use taxes.  That figure increased significantly during the holiday months of November and December, when the Debtor respectively paid approximately $1.2 million and $1.6 million in sales and use taxes.

**B.     Sales**

27.     For the Debtor's fiscal year beginning in April 2020 through December 2020, the Debtor's net sales were approximately $111,162,000, down nearly 21% from approximately $140,861,000 in net sales for the same period in 2019.

28.     Although the Debtor was experiencing a shift to e-commerce sales prior to the COVID-19 pandemic, the trend greatly accelerated during the pandemic due to emergency government orders closing or limiting retail store operations for prolonged periods and general consumer reluctance to shop in person.  From April through December 2019, brick-and-mortar retail sales comprised 61.7% of the Debtor's overall sales.  However, for that same period in 2020, a time entirely encompassing the pandemic, brick-and-mortar retail sales declined by

56.5% and comprised just 34% of the Debtor's total sales.  Meanwhile, the Debtor's e-commerce sales have dramatically increased by 72%, and have gone from comprising 19.6% of the Debtor's overall sales to 42.7%.

29.     Additionally, almost all of the Debtor's products and inventory are imported from International and affiliates and processed through the Distribution Center in Dayton, New Jersey.[6]  The amount of imported products that the Debtor declared to U.S. customs during the COVID-19 pandemic, in both value and quantity, declined sharply.  Specifically, from January to December 2019 the Debtor declared $41,320,664 in quantity and $42,124,708 in value to customs.  Whereas from January to December 2020, the Debtor declared $26,940,363 in quantity and $29,568,177 in value to customs.  This further evidences the significant impact that the pandemic has had on the Debtor's sales.

### C.     Employees

30.     The Debtor's employees are central to its success. The Debtor employs approximately 1,051 people in the United States, with 125 of those employees on the corporate management team primarily based in New York and New Jersey.  The employees are comprised of 406 full-time employees, 637 part-time employees, and 8 temporary/contract employees.  The employees serve in many capacities supporting the Debtor's operations at the corporate office, the Distribution Center, and its retail boutiques.  As detailed below in the summary for the Employee Obligations Motion (and more thoroughly in the motion), the Debtor offers employees various benefit policies and options.  The Debtor made the difficult decision to furlough 325 employees due to the COVID-19 pandemic.  Of those 325 employees, 165 have returned to the

---

[6] One exception is hand sanitizer that is produced in California.

Debtor's employee base.  Unfortunately, due to the adverse conditions of the last ten (10) months, the Debtor made the difficult determination to lay off approximately 40 employees.

31.     The Debtor's payroll is made every two weeks.  The most recent payroll, totaling approximately $1,255,315.18,[7] was made on January 22, 2021.  The Debtor's first post-petition payroll will be made on February 5, 2021, and the total amount be expected to be paid is $1,181,159.84,[8] of which approximately $700,000.00 is for compensation earned prior to the Petition.  The Debtor's officers and directors earn approximately $106,489.00 per month before deductions.  It is anticipated that the Debtor's payroll obligations will decrease over the course of the Chapter 11 Case as there will be some reduction in the Debtor's workforce related to the closure of stores and rejection of leases.  As of the Petition Date, the Debtor is current on all payroll taxes.  Approximately $500,000.00 will be due on the Debtor's next payroll date, February 5, 2021, of which approximately $285,000.00 relates to payroll taxes for employee compensation earned before the Petition Date (of that amount, approximately $222,000.00 is for statutory deductions, and $63,000.00 in employer taxes).

### D.     Insurance Policies

32.     The Debtor also maintains several insurance policies, including for, among other things, (a) Property / Boiler & Machinery, (b) General Liability, (c) Automobile, (d) Workers' Compensation / Employee Liability, (e) Umbrella/Excess Liability, (f) FINPRO including: D&O, Fiduciary, Employment Practices, Crime, and Special Risk; (g) a Foreign Package including: Commercial GL, Contingent Commercial Auto, Employee Benefits, Employers Responsibility, Contingent Employers Liability, Accidental Death & Dismemberment, Special

---

[7] This includes approximately $57,155.34 in sales incentive bonuses.

[8] This does not include potential additional sale incentive bonuses.

Risk; and (h) Cyber.  The Debtor has paid the premiums for these policies in full through April 1, 2021.

### III.    Events Precipitating Filing and Goal in Chapter 11

33.    As has been the case with brick-and-mortar retailers across the United States and the rest of the world, the unprecedented COVID-19 pandemic has substantially affected the Debtor's business and has greatly accelerated the need for a long-term strategic solution.  In particular, due to state and local emergency orders issued during the pandemic, the vast majority of the Debtor's boutiques were either operating with reduced hours or capacity, or were closed entirely for extended periods.  Due to the pandemic and the resulting government restrictions, the Debtor made the business decision to close all of its stores in mid-March 2020.  Between May and October 2020, most of the Debtor's boutiques gradually re-opened depending on the status of local restrictions and conditions, though a few locations remain closed.[9]  To the extent locations have re-opened, virtually all are operating with reduced hours and capacity limitations based on local restrictions and conditions.  Consequently, as noted above, retail sales from the brick-and-mortar locations have precipitously declined by 56.5% since April 2020 compared to the prior year.

34.    The pandemic has also understandably generally suppressed consumer willingness to shop in person, particularly in indoor malls where the bulk of the Debtor's boutiques are located and social distancing is difficult.[10]  It is not anticipated that this trend will change in the near future, as the COVID-19 pandemic has reached its highest levels of infection

---

[9] Of the currently closed boutiques, it is anticipated the one or two located in airports may re-open.

[10] *See* Bachman, Daniel, Barua, Akrur, and Gunnion, Lester, "COVID-19 Will Weigh on Consumer Spending Till Vaccination Change the Game," Deloitte Economics Spotlight (December 2020), *available at* https://www2.deloitte.com/us/en/insights/economy/spotlight/economics-insights-analysis.html (last accessed January 22, 2021) (includes a statistical examination of the decline in consumer spending due to COVID-19 and noting that "consumers have been wary of places where social distancing is difficult.").

over the last month[11] and the vaccine rollout has been slow.[12]  Consequently, consumer habits

have changed and there has been a decided shift away from in-person retail shopping in favor of

online purchasing that is predicted to endure even after the pandemic subsides.[13]  As noted

above, the Debtor's e-commerce sales have risen by 72% since April 2020 and now comprise

nearly half of the Debtor's overall net sales, while brick-and-mortar retail sales have fallen from

nearly two-thirds of the Debtor's total net sales to just over one-third.

35.     The world has been forever changed by the pandemic.  The Debtor is now saddled

with hefty lease obligations that were entered into under circumstances completely different from

where we are today, under which the societal altering impact of the pandemic was never

anticipated.  Even so, the Debtor was experiencing a decline in brick-and-mortar retail sales prior

to the pandemic that was becoming increasingly untenable, leading to the Debtor's efforts to

adjust its brick-and-mortar presence.  The pandemic has expedited this issue, further highlighting

that the lease obligations have become an albatross around the Debtor's neck.

36.     In the face of the mounting financial difficulties of the pandemic, the Debtor's

management instituted various mitigation measures, including implementing recurring reviews

of its workforce needs which led to reducing workforce (including at the corporate office level)

either permanently in some cases or through furloughs, consolidating roles, reducing marketing

---

[11] According to the Centers for Disease Control and Prevention (the "CDC"), as of January 21, 2021, there has been a daily national average of 215,572 new cases of COVID-19 reported thus far in January 2021, peaking at an all-time high of 314,093 on January 8, 2021.  Reported deaths from COVID-19 have also been steadily rising each month since September 2020, and have averaged 3,057 per day nationally in January 2021 (through January 21, 2021).  *See* Centers for Disease Control and Prevention COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#trends (last accessed, January 22, 2021).

[12] *See* Hopkins, Jared S. and Campo-Flores, Arian, "Covid-19 Vaccine's Slow Rollout Could Portend More Problems," Wall Street Journal (January 1, 2021).

[13] *See* Salpini, Cara, "What 6 Charts Say About the Pandemic's impact on Retail," retaildive.com (January 21, 2021), *available at* https://www.retaildive.com/news/what-6-charts-say-about-the-pandemics-impact-on-retail/593102/ (noting decline in retail foot traffic and increase in e-commerce sales, both of which are expected to continue).

expenses, and halting capital expenditure projects. Unfortunately, the impact of the pandemic has proven too steep and enduring despite these initiatives, and it has become clear that more holistic efforts centered on the Debtor's lease obligations are needed to preserve the Debtor long-term. The Debtor simply is not generating enough revenue from brick-and-mortar sales to meet its lease obligations. As noted, consumer purchasing habits have changed as a result of the pandemic, and it may be years before brick-and-mortar retail sales return to pre-pandemic levels, if ever. In the meantime, the Debtor's lease obligations, which unfortunately no longer accurately reflect the market, will become an increasingly heavy anchor for the Debtor and may ultimately threaten the Debtor's viability. Relief in chapter 11, and in particular, the rejection of certain burdensome leases, is necessary to enable the Debtor to adapt to the new economic realities with the goal of bolstering the Debtor's long-term viability and preserving the Debtor's workforce.

37.    The struggles in the retail sector during the pandemic have not been unique to the Debtor, as several other recognizable retail brands, including J. Crew, True Religion Apparel, Lucky Brand Dungarees, Brooks Brothers, Tuesday Morning, New York & Co., Sur La Table, and Guitar Center, among others have filed for chapter 11 proceedings since the start of the pandemic. Several of these entities have specifically sought to reject leases in chapter 11 in an effort to help right-size and sustain their businesses in light of the pandemic including, but not limited to J. Crew, True Religion Apparel, Lucky Brand Dungarees, and Brooks Brothers.

38.    Against this backdrop, in the months prior to the Chapter 11 filing, the Debtor and its advisors worked tirelessly to solicit and develop strategies to maximize value for its stakeholders. Most pertinently, the Debtor negotiated diligently with its landlords to reach terms that would have resulted in an out-of-court restructuring. In particular, the Debtor undertook the

significant effort to obtain rent concessions from the Debtor's landlords.  These efforts included

retaining Hilco Real Estate as a consultant to assist the Debtor in attempting to renegotiate

leases.  Unfortunately, the Debtor was unable to execute a satisfactory out-of-court restructuring

as landlords generally exhibited reluctance to negotiate long-term adjustments to leases.  As of

the Petition Date, at least thirteen (13) landlords have commenced actions for amounts due under

leases, and dozens more have issued demand letters.

39.     Because it was engaged in negotiations with its landlords prepetition to modify

the terms of its leases, the Debtor did not pay any rent obligations in January 2021, and also did

not remit rent on certain other leases in prior months.  However, the Debtor has generally paid its

vendors, suppliers, service providers, and trade creditors in the ordinary course of its business.

40.     After much deliberation and consultation with its professionals and advisors, the

Debtor has determined in its business judgment that restructuring through chapter 11 presents the

best avenue for the Debtor to address its challenges and promote sustained success.  In particular,

through this Chapter 11 Case, the Debtor intends to right-size its brick-and-mortar footprint

through the rejection of burdensome leases in order to restructure and strengthen its financial

picture for its go-forward business, including preserving as many as of its employees as possible.

To this end, the Debtor's management team and advisors have determined at the outset of the

Debtor's Chapter 11 filing that it is appropriate to close and reject the leases for twenty-three

(23) locations.  In formulating this list of initial closing locations, the Debtor considered such

factors as the location's historic sales in relation to the remaining lease obligations, recent sale

trends, the geographic market in which the store is located including proximity to other

boutiques operated by the Debtor, the prospects to negotiate rent reduction with the applicable

landlords, and other circumstances related to a specific boutique's performance. Additional closing locations may be identified as the Debtor's Chapter 11 case progresses.

41.    Although difficult, it is believed that closing boutique locations and rejecting leases is necessary especially in light of the new realities brought on by the pandemic, and will help maximize recovery for creditors. The Debtor determined it was prudent to act now in order to minimize liabilities from mounting lease obligations that are becoming increasingly difficult to fulfill, and put the Debtor in the best position for long-term success for its various stakeholders through an appropriate right-sizing of the Debtor's business.

## IV.    Summary of First Day Motions

42.    To minimize the adverse effects of the commencement of the Chapter 11 Case on the Debtor's ability to effectuate an efficient chapter 11 restructuring that will maximize value of the Debtor's estate, the Debtor has filed a number of First Day Motions designed to facilitate a smooth transition into chapter 11.

43.    I anticipate that the Bankruptcy Court will conduct a hearing soon after the Petition Date at which time the Court will consider the First Day Motions. Certain of the First Day Motions seek authority to pay prepetition wages and other prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides, in pertinent part, that the Court will not consider motions to pay prepetition claims during the first 21 days following the filing of a Chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." Cognizant of this requirement, the Debtor has narrowly tailored its requests for immediate authority to instances where failure to pay such claims would cause irreparable harm to itself and its estate.

44.     Accordingly, the Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in preserving the value of the Debtor's estate for the benefit of all parties in interest.

45.     I have reviewed each of the First Day Motions with the Debtor's attorneys and professionals, and the facts stated therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each First Day Motion is tailored to meet the goals described above, is necessary and critical to the Debtor's reorganization efforts, and is in the best interest of the Debtor's estate and creditors.  I hereby adopt and affirm the factual representations contained in each of the First day Motions.  To the extent the First Day Motions seek authority to pay certain pre-petition claims as necessary to continue the Debtor's operations, the Debtor has sufficient availability of funds to pay such obligations.

**A.      Debtor's Motion Pursuant to Bankruptcy Rule 1007(c) for Entry of Order Granting Additional Time for Filing Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedules of Executory Contracts and Unexpired Leases (the "Schedules Extension Motion")**

46.     Due to the size and complexity of the Debtor's operations, the Debtor believes that it will be unable to complete the Schedules and Statements during the fourteen day period provided under Bankruptcy Rule 1007(c), and it would be unnecessarily burdensome for the Debtor to attempt to do so during the first fourteen days of the Chapter 11 Case as the Debtor has a number of different tasks to complete upon the filing of the Chapter 11 Case.

47.     Although the Debtor has commenced the process that will enable it to prepare and finalize what will be voluminous Schedules and Statements, and the Debtor is working diligently with its proposed claims and noticing agent, Stretto,[14] to move the process forward, the Debtor anticipates that it will require additional time to complete the Schedules and Statements to the

---

[14] Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

satisfaction of the Court.  The Debtor therefore requests through the Schedules Extension Motion

an additional thirty (30) days to file its Schedules and Statements.

**B.      Debtor's Application Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto as Claims and Noticing Agent and (II) Granting Related Relief (the "<u>Claims Agent Application</u>")**

48.      The Debtor seeks to retain Stretto as the Claims and Noticing Agent.  The Debtor

anticipates that there will be a large number of entities to be noticed in this Chapter 11 Case.

The Debtor obtained and reviewed engagement proposals from at least two other court-approved

claims and noticing agents to ensure selection through a competitive process.  The Debtor

selected Stretto because of its vast experience and expertise in chapter 11 case administration and

because the rates that Stretto offered the Debtor for the services to be provided are competitive

and reasonable given Stretto's reputation and expertise.  The Debtor understands that Stretto is

one of the country's leading chapter 11 administrators and has developed and utilizes efficient

and cost-effective methods.  The Debtor thus believes it is in the best interest of the Debtor's

estate to retain Stretto to perform certain administrative services under 28 USC § 156(c).

**C.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms; and (II) Waiving Investment and Deposit Requirements (the "<u>Cash Management Motion</u>")**

49.      Pursuant to the Cash Management Motion, the Debtor requests (i) authority to

continue to use the Debtor's existing (a) cash management system and bank accounts, (b)

business forms, (c) implement changes to its Cash Management System in the ordinary course of

business, including opening new or closing existing Bank Accounts, business forms, and (ii) a

waiver of investment and deposit requirements.

50.      The Debtor uses an integrated, centralized Cash Management System to collect,

concentrate, and disburse funds generated by its operations.  The Cash Management System is

tailored to meet the Debtor's needs as a retail operator with 166 boutiques and a website.  The

Cash Management System enables the Debtor to efficiently collect and disburse cash generated

by its brick-and-mortar and online sales, pay its financial obligations, including to employees,

vendors, and landlords, monitor and control corporate funds and available cash, and efficiently

obtain accurate account balances and other financial data.  Although a portion of the system is

automated, the Debtor's accounting director (the "Accounting Director") and his personnel

monitor the Bank Accounts and manage the day-to-day collection and disbursement of funds.

51.    As of the Petition Date, the Debtor maintains the following bank accounts (the

"Bank Accounts"):

a.    An operating account at Wells Fargo, ending in 0426 (the "Main Operating Account").  Prior to the Petition Date, the Main Operating Account was the Debtor's primary bank account, which held all deposits of the Debtor's customers and other money received by the Debtor, and was used to make payments to vendors and for general operating expenses.  As of close of business on January 25, 2021, the Main Operating Account has a balance of $4,467,129.34.

b.    A payroll account at Wells Fargo ending in 0439 (the "Payroll Account").  Prior to the Petition Date, the Payroll Account was the primary account used to make payment to the Debtor's Employees.  As of close of business on January 25, 2021, the Payroll Account has a balance of $5,000.00.

c.    Six (6) Store accounts at Bank of the West (1855), Banco Popular (1086), Chase (7328), Bank of America (7702), Wells Fargo (4858), and Bank of America (3258) (collectively, the "Store Accounts").  The Store Accounts receive funds and cash deposits from store activities and then transfer the money into the Main Operating Account.  As of close of business on January 25, 2021, the Store Accounts collectively have a balance of $26,838.99.

d.    A credit card collections account at Wells Fargo ending in 0442 (the "Credit Card Account").  The Credit Card Account collects revenue from credit cards and card fees and then transfers the collected amounts to the Main Operating Account.  As of close of business on January 25, 2021, the Credit Card Account has a balance of $0.00.

e.    A multi-currency account at Wells Fargo ending in 6390 (the "Canadian Collections Account").  The Canadian Collections Account receives Canadian payments for inventory sales to Canada. The payments collected are then

transferred to the Main Operating Account.  As of close of business on January 25, 2021, the Canadian Collections Account has a balance of $22,738.67.

Attached as Exhibit A to the Cash Management Motion is a chart illustrating the flow of funds among the Bank Accounts.

52.     I believe the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all parties-in-interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Case with minimal disruption.  Maintaining the Cash Management System is critical to the Debtor's successful day-to-day operations, without which the Debtor would suffer immediate and irreparable harm.  For the foregoing reasons, I respectfully submit that the Cash Management Motion should be granted.

> **D.**     **Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Taxes and Fees in the Ordinary Course of Business (the "Tax Motion")**

53.     The Debtor requests entry of interim and final orders authorizing, but not directing, the Debtor to remit certain taxes and fees owed to the appropriate taxing authorities in the ordinary course of business, as such payments become due and payable and to the extent adequate funds are available to make such payments.

54.     In the ordinary course of business, the Debtor incurs and collects from customers state and local taxes charged in connection with the sale of various products to customers (the "Sales Taxes").  Further, the Debtor purchases various materials and supplies necessary for the operation of its day-to-day business and incurs use taxes (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes") in connection with such purchases.

55.     The Debtor remits Sales and Use Taxes generally on a monthly basis.  As noted above, for the months of January through October 2020, the Debtor paid an average of $514,000.00 in Sales and Use Taxes.  That figure increased significantly during the holiday

months of November and December, when the Debtor respectively paid approximately $1.2 million and $1.6 million in Sales and Use Taxes.  As of the Petition Date, the Debtor believes it is current with respect to its payment of Sales and Use Taxes, however the Debtor estimates that $577,000.00 in Sales and Use Taxes will be owed for the month of January and payable after the Petition Date.  To the extent any pre-petition Sales and Use Taxes are owed to taxing authorities, such taxes are not property of the estate but, rather, are held in trust for the taxing authorities (the "Authorities").  The Debtor seeks to pay the prepetition Sales and Use Taxes in order to, among other things, prevent the Authorities from taking actions that might interfere with the administration of the Debtor's Chapter 11 Case, including bringing personal liability actions against the Debtor's officers and directors or other key employees or assessing penalties or interest on past due taxes.  Additionally, if the Debtor does not pay the Sales and Use Taxes that it owes, it may give rise to a priority claim pursuant to section 507(a)(8) of the Bankruptcy Code.

56.    The Debtor must pay the Sales and Use Taxes to continue its business operations and the failure to pay those taxes could adversely affect the Debtor's business operations.  As noted above, the Debtor estimates that $577,000.00 in Sales and Use Taxes will be owed for the month of January and payable after the Petition Date.  Although the Debtor has sufficient availability of funds to pay this amount in the ordinary course of business, to help ensure timely payment of Sales and Use Taxes, the Debtor proposes to escrow $577,000.00 to pay the estimated Sales and Use Taxes obligations due in February.  This figure is approximately 8% of the Debtor's projected retail and e-commerce sales.

57.    Accordingly, for the reasons set forth herein and in the Tax Motion, I respectfully submit the relief requested in the Tax Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of the Debtor's estate, its creditors and parties-in-interest and will

enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate.  Absent the relief requested in the Tax Motion, the Debtor will suffer immediate and irreparable harm.

> **E.**      **Motion of Debtor for Interim and Final Orders Authorizing Payment of Certain Prepetition Shipping Charges in the Ordinary Course of Business and Granting Related Relief (the "<u>Shipping Motion</u>")**

58.      The Debtor's products are primarily imported from the Parent.  The Distribution Center is essentially the nucleus of the Debtor's operations, as all of the Debtor's stock and inventory (the "<u>Merchandise</u>") flows through the Distribution Center before reaching the retail boutiques.  In order to ensure that all of the Merchandise arrives at the Distribution Center, the Debtor utilizes a carrier company, PJT Transport & Logistic Services Inc. (the "<u>Carrier</u>") to transport the Merchandise from the Port of Elizabeth, New Jersey (the "<u>Port</u>").  The Carrier is a vital part of the Debtor's business.   The Debtor thereafter heavily relies upon shippers ("<u>Shippers</u>") to transport the Merchandise from the Distribution Center to its boutiques and customers.  As detailed in the Shipping Motion, the Debtor uses a variety of Shippers and is a party to three (3) different shipping contracts (the "<u>Shipping Contracts</u>").   Moreover, the Debtor works with an importation broker and an exportation broker (the "<u>Brokers</u>") in order to ensure that the receipt and delivery of merchandise in and out of the United States is a seamless process.  This includes transportation of products to customers in Canada as well as stores operated by the Debtor's Canadian affiliate.

59.      As of the Petition Date, it is estimated that approximately $304,334.00 is due to the parties listed above or will soon become due, including an anticipated $262,038.00 during the first twenty-one (21) days after the Petition Date.

60.     It is also anticipated that on the Petition Date that inventory may be in transit either between the Port and the Distribution Center, or between the Distribution Center and the Debtor's boutiques or customers.  It is possible that parties may refuse to release or complete delivery of goods absent payment from the Debtor.

61.     Failure by any of the Carrier, Brokers, or Shippers (collectively, the "Shipping Parties") to process or complete delivery of Merchandise or continue to provide shipping-related services to the Debtor will cause irreparable harm to the Debtor through interrupting the Debtor's inventory chain.  It is therefore respectfully submitted that it is imperative for the Debtor to pay prepetition shipping-related charges that are owed either directly or indirectly to the Shipping Parties to the extent that the Debtor determines, in its business judgment, that such payments are necessary or appropriate to facilitate delivery of merchandise.  Such payments are necessary to (a) ensure the delivery of merchandise to the Debtor's Distribution Center, (b) secure the continued delivery, distribution, and sale of the Debtor's goods to its boutiques and customers in the event that the Debtor incurs obligations to shippers for such deliveries, and (c) satisfy (or avoid the imposition of) liens, if any, in respect of amounts owed to such parties.

62.     If the Debtor is not granted the relief requested in the Shipping Motion, there may be a significant delay and interruption in the transportation and delivery of Merchandise to the Debtor's boutiques and to the Debtor's customers.  The Debtor has spent a considerable amount of time securing the agreed upon rates with its long time Shippers.  It is of the utmost importance that during this Chapter 11 Case the Debtor's shipping arrangements and transportation of merchandise is uninterrupted so the Debtor can continue to provide product to its customer base.

Accordingly, on behalf of the Debtor, I submit that the relief requested in the Shipping Motion should be granted.

      **F.**      **Motion for Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a), Authorizing Debtor to (I) Pay Certain Pre-Petition Date Employee Wages, Benefits, Expenses and Other Obligations; and (II) To Continue Employee Benefit Programs (the "<u>Employee Obligations Motion</u>")**

63.     Pursuant to the Employee Obligations Motion, the Debtor seeks interim and final orders authorizing, but not directing, it to pay and/or honor certain obligations owing to the Debtor's employees, including prepetition wages, reimbursable employee expenses, benefits and other obligations (as more specifically set forth and defined in the Employee Obligations Motion, the "<u>Employee Obligations</u>").  The Debtor seeks authority to honor the Employee Obligations as such obligations are critical and essential to employee morale and future business needs.

64.     As of the Petition Date, the Debtor has approximately 1,051 active employees (the "<u>Active Employees</u>") spread across 36 states.  Out of the approximately 1,051 Active Employees, 406 are full-time (the "<u>Full Time Employees</u>"), 637 are part-time (the "<u>Part Time Employees</u>"), and 8 are temporary/contract employees (the "<u>Contract Employees</u>", together with the Full Time Employees and the Part Time Employees, the "<u>Employees</u>").

65.     The Debtor's employees are invaluable to the Debtor's business.  They perform critical functions, including sales, customer service, IT, administrative, legal, accounting, finance and management related tasks.  Their skills and experience and their relationships with customers and vendors are essential to the Debtor's ongoing operations and its ability to effectively operate its business during the Chapter 11 Case.

66.     Due to the devastating impact of the COVID-19 pandemic, the Debtor continually assessed its workforce needs and took steps to minimize costs and adjust to the impact of the outbreak.  As noted above, the Debtor made the difficult decision to lay off approximately 40

employees and furlough 325 others, of which, 165 have returned back to work.[15]  The current

number of Employees includes those Furloughed Employees that have returned to work.

67.    The Debtor's average weekly payroll, based on 2020 payroll to date, is

approximately $1.3 million per week, and was approximately $1,255,315.18 for the most

recently payroll made on January 22, 2021.  As noted above, this figure is expected to decline

due to some attrition to the Debtor's workforce resulting from store closures and lease rejection.

The Debtor's next payroll is scheduled for February 5, 2021, which payroll will cover the pay

period from January 18, 2021 through January 31, 2021.  In the ordinary course, the Debtor pays

its employees on a bi-weekly basis, every other Friday.  Thus, some of the Debtor's next payroll

will encompass pre-petition wages owed to the Employees.  The Debtor requests authority to pay

pre-petition employee claims and benefits to the extent that would otherwise be allowed as

priority claims under section 507(a)(4) and (a)(5) of the Bankruptcy Code,[16] and to continue to

pay post-petition costs associated with the Employee Claims.

68.    As more fully set forth in the Employee Obligations Motion, the Debtor pays

bonuses to employees, on a monthly basis, based on the sales targets which were achieved

throughout the preceding month (the "Sales Incentive Program").

69.    The Debtor also offers to its eligible employees the opportunity to enroll in a

variety of employee benefit plans and policies which include, health insurance, paid days off,

sick leave, and workers compensation (the "Employee Benefit Programs").  As further detailed

in the Employee Obligations Motion, the Time Off Policies, the Health Care Plans, COBRA

---

[15] The Furloughed Employees retained health insurance benefits.

[16] Approximately six (6) of the Debtor's employees are owed in excess of the $13,650.00 threshold set forth in section 507(a)(4) of the Bankruptcy Code.  The Employee Obligations Motion is not requesting authorization to compensate employees in excess of this this amount.

benefits, life insurance plans, Disability Programs, Additional Employee Benefits, and 401k Plan are essential parts of the Debtor's business model.

70.      I believe that the failure to grant the relief requested in the Employee Obligations Motion would create instability in the Debtor's Employee workforce and hinder its reorganization efforts.  Absent the Court granting the relief requested, the Debtor's Employees may seek alternative opportunities, perhaps with the Debtor's competitors.  The loss of valuable employees would deplete the Debtor's workforce and thereby hinder the Debtor's ability to meet its customer obligations and its ability to successfully preserve its going-concern value.  It would also injure employee morale and loyalty during the Debtor's reorganization process, a time when the Debtor especially needs to preserve Employees' morale.

71.      Further, most Employees rely on their compensation and benefits to satisfy their living expenses and healthcare.  Particularly in light of the ongoing pandemic, the Employees would be exposed to significant financial difficulties and health issues if the Debtor is not permitted to honor its obligations for unpaid compensation, benefits, and reimbursable expenses.

72.      Additionally, in order to enable the relief requested in the Employee Obligations Motion, the Debtor also requests that the Debtor's banks, including Wells Fargo, be authorized to receive, process, honor and pay all of the Debtor's prepetition checks and fund transfers on account of any Employee Obligations, and prohibiting the bank from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or any other party related to the Employee Obligations, without any duty of further inquiry and without liability for following the Debtor's instructions.

73.      For the reasons set forth herein and in the Employee Obligations Motion, I respectfully submit that the relief requested in the Employee Obligations Motion is necessary

and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest, and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate.  Absent the relief requested in the Employee Obligations Motion, the Debtor will suffer immediate and irreparable harm.

  **G.**  **Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (I) Maintain Certain Customer Programs; (II) Honor or Pay Related Prepetition Obligations in Respect Thereof; (III) Direct Debtor's Payment Processors to Honor Merchant Agreement Pending Assumption or Rejection; and (IV) Granting Related Relief (the "<u>Customer Program Motion</u>")**

  74.  Through the Customer Program Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor, in its business judgment, to (i) honor and maintain prepetition Customer Programs (defined below); (ii) pay and honor related prepetition obligations to their customers; (iii) pay any prepetition Processing Obligations (defined below) to the Payment Processor (defined below) in connection with processing Non-Cash Payments (defined below) and directing the Payment Processor to honor the Merchant Agreement (defined below) pending the Debtor's assumption or rejection of said agreement; and (iv) granting related relief.

  75.  The Debtor provides certain accommodations and incentives to its customers to attract an expansive customer base and cultivate loyalty.  As detailed more fully in the Customer Program Motion, the Debtor's customer programs include a Return and Exchange Policy, a Gift Card Program, and various Coupons and Sales Promotions (collectively, the "<u>Customer Programs</u>").  The Debtor estimates that, as of the Petition Date, there are approximately $1,587,278.00 in outstanding obligations under the Gift Card Program and an open credit balance as of December 31, 2020 of $859,341.00 related to the Return and Exchange Policy. These programs require no cash outlay by the Debtor.

76.     I believe that continuing to honor the Customer Programs during the Chapter 11 Case is vital to protect the Debtor's valuable customer relationships and goodwill, thus preserving the Debtor's value to the benefit of the Debtor's estate, its creditors, and all parties-in-interest.   The Customer Programs are designed to attract additional customers and cultivate loyalty, which is extremely important as the Debtor navigates through chapter 11.   Accordingly, I respectfully submit that the Customer Programs are necessary and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate.   Absent the relief requested in the Customer Program Motion, the Debtor will suffer immediate and irreparable harm.

77.     Additionally, the Debtor accepts non-cash payments through a variety of credit cards as well as PayPal and Amazon Pay.   The Debtor has contracted with Adyen B.V. ("Adyen") to process non-cash payments.   Non-cash payments comprise a significant portion of the Debtor's revenue, particularly as internet sales have risen since the start of the COVID-19 pandemic.   It is thus critical that the Debtor be able to pay any prepetition processing-related obligations and continue uninterrupted its relationship with Adyen under the existing agreement.

**H.      Debtor's Motion for an Order Authorizing (I) Rejection of Certain Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6004 and 6006, (II) Abandonment of Any Personal Property, Effective as of the Rejection Date, and (III) Granting Related Relief (the "Lease Rejection Motion")**

78.      The Debtor seeks entry of an order, authorizing the Debtor to (a) reject certain unexpired leases of non-residential real property, any amendments, modifications, or subleases thereto (each, a "Lease" and collectively, the "Leases"), a list of which is annexed as Schedule 1 to Exhibit A attached to the Lease Rejection Motion, (b) abandon certain equipment, fixtures,

furniture, or other personal property that may be located at the premises and not otherwise moved to another store location (collectively the "Personal Property"), both rejection of Leases and abandonment of Personal Property to be effective as of the Lease Rejection Date (as defined below), and (c) granting related relief.

79.    Prior to the Petition Date, the Debtor and its advisors began a comprehensive review and store-by-store analysis of its lease portfolio and the performance of each of its stores analyzing various aspects of the Debtor's operations in connection with the Debtor's restructuring efforts.  An integral part of this analysis included evaluating the profitability of the Debtor's unexpired leases and identifying and shedding unnecessary and burdensome leases. Based on this analysis, the Debtor has identified twenty-eight (28) burdensome leases and one (1) related sublease that it wishes to reject at the outset of its Chapter 11 case for the benefit of the Debtor and its estate.

80.    The Leases to be rejected provide no benefit to the Debtor's estate or the Chapter 11 case.  Due to the COVID-19 pandemic, like most retail establishments, the Debtor's online sales have been increasing while its brick-and-mortar sales have been in a steady decline.  By rejecting the Leases, the Debtor believes that it will save significant dollars per month in rent and associated costs.  Absent rejection, the Debtor would be obligated to pay rent under the Rejected Leases even though they will have ceased operations at, and will no longer be in possession of, such locations.

81.    In addition to the payment of rent, the Debtor may be obligated under the Rejected Leases to pay certain real property taxes, insurance, utilities, and other charges.  The Debtor will have vacated the stores identified in the Lease Rejection Motion and returned possession to the various landlords by the Rejection Date.  Therefore, in an effort to reduce

unnecessary post-petition rent and administrative costs, the Debtor has determined, in its reasonable business judgment, that it is in its best interest of its estate to reject the Rejected Leases set forth on Schedule 1, effective as of the applicable Rejection Date.

82.     Prior to the Debtor vacating the stores for the Rejected Leases, the Debtor has reviewed or will review and evaluate the personal property remaining in the premises (the "Personal Property") to determine whether (i) the Personal Property is of inconsequential value or (ii) the cost of removing and storing the Personal Property for future use, marketing or sale exceeds its value to the Debtor's estate.

83.     In the event that the Personal Property is of inconsequential value or a burden to the Debtor's estate, the Debtor may choose, in its business judgment, to abandon it.  Therefore, to reduce the post-petition administrative costs and in the exercise of its sound business judgment, the Debtor believes that abandonment of the Personal Property as of the applicable Rejection Date is appropriate and in the best interest of the Debtor, its estate and its creditors.

84.     Accordingly, for the reasons set forth herein and in the Lease Rejection Motion, I respectfully submit that relief requested in the Lease Rejection Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate.  Absent the relief requested in the Lease Rejection Motion, the Debtor will suffer immediate and irreparable harm.

**I.      Debtor's Motion for Entry of an Order Authorizing and Approving Procedures For Rejection and Assumption of Executory Contracts and Unexpired Leases (the "Procedures Motion")**

85.     The Debtor seeks entry of an order authorizing and approving procedures (the "Procedures") for the rejection, assumption, and assumption and assignment of executory contracts and unexpired leases.

86.     The Debtor believes that an order approving the Procedures will streamline its ability to reject burdensome executory contracts ("Contracts") and unexpired leases ("Leases") that no longer provide a benefit to the Debtor's estate and assume beneficial Contracts and Leases, while also providing parties in interest with adequate notice of the rejection or assumption of a Contract and a Lease and an opportunity to object to such relief within a reasonable time period.

87.     Absent the relief requested herein, filing multiple motions for the rejection or assumption of each Contract and Lease would result in substantial costs to, and impose administrative burdens on, the Debtor's estate, in addition to the burden such approach would place on the Court's docket and calendar.  As such, the proposed Procedures for rejection or assumption of Contracts and Leases are appropriate and necessary to limit the costs and administrative burdens that otherwise would be borne by the Debtor's estate.

88.     Accordingly, for the reasons set forth herein and in the Procedures Motion, I respectfully submit that relief requested in the Procedures Motion is necessary and critical to the Debtor's ability to preserve value for the benefit of Debtor's estate, its creditors and parties-in-interest and will enable the Debtor to continue to operate its business with minimal disruption, thereby maximizing value for the estate.  Absent the relief requested in the Procedures Motion, the Debtor will suffer immediate and irreparable harm.

I certify that the foregoing statements made by me are true and I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By:   */s/ Yann Tanini*
               Yann Tanini, Regional Managing Director

Dated:  January 26, 2021

Active\116512012.v16